```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

UNITED STATES OF AMERICA                 12 Cr. 865-01 (RWS)

     - against -                         SENTENCING OPINION

ALAIN DARGE,

                    Defendant.
------------------------------------X
```

**Sweet, D.J.**

On November 20, 2012, Alain Darge ("Darge" or "Defendant") pleaded guilty to the following charges: (i) Count One: conspiracy to distribute one kilogram of heroin, in violation of 21 U.S.C. §§ 841(b)(1)(A) & 846; (ii) Count Two: using and carrying firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) & (2).

For the reasons set forth below, Darge will be sentenced to a term of 45 months' imprisonment and five years of supervised release.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/27/13

1

**Prior Proceedings**

On August 7, 2012, Darge was charged in a one-count criminal complaint with conspiracy to distribute and to possess with intent to distribute one kilogram and more of mixtures and substances containing a detectable amount of heroin. Darge was arrested and presented on the complaint the same day.

On November 20, 2012, Darge appeared before the Court to waive indictment and plead guilty to a two-count information, 12 Cr. 865 (RWS). Count One of the information charged Darge with participating in a conspiracy to distribute and possess with intent to distribute one kilogram and more of mixtures and substances containing a detectable amount of heroin, from at least in or about 1993, up to and including in or about May 2012, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A). Count Two of the information charged Darge with, during and in relation to a drug trafficking crime, knowingly using and carrying firearms, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) & (2).

Darge's guilty plea was entered pursuant to a cooperation agreement with the Government.

Darge's sentencing is currently scheduled for September 19, 2013.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), and the Second Circuit's decision in <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

   (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2)  the need for the sentence imposed —

      (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B)  to afford adequate deterrence to criminal conduct;

      (C)  to protect the public from further crimes of the defendant; and

      (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the

>            most effective manner;
>
> (3)   the kinds of sentences available;
>
> (4)   the kinds of sentence and the sentencing range established for —
>
>    (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;
>
> (5)   any pertinent policy statement . . . [issued by the Sentencing Commission];
>
> (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 114-15.


**The Defendant**

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Darge's personal and family history.

**The Offense Conduct**

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that document.

In February 2011, Homeland Security Investigations ("HSI") received information regarding a heroin-distribution source based in the Bronx, NY. The case agent subsequently identified the source as Alain Darge, a/k/a "Boozer," a/k/a "Primo." On August 3, 2011, HSI special agents wiretapped a telephone conversation between a cooperating witness (the "CW") and Darge. During this call, Darge agreed to meet with the CW in Queens County, NY to discuss details regarding $90,000 which Darge indicated he owed to another heroin importer (the "Heroin Importer") known to law enforcement.

On August 3, 2011, following the telephone call between the CW and Darge, the CW met with Darge. During this surveilled meeting, Darge inquired as to whether the CW could bring in loads of heroin. Darge noted that he would make a purchase and acquire funds to begin paying off the $90,000 owed to the Heroin Importer. Darge provided the CW with his personal

5

contact information so that he and the CW could make arrangements to meet at a future date. Following this meeting, law-enforcement agents followed Darge to an apartment in the Bronx, NY (the "Bronx Apartment").

On May 3, 2012, the CW phoned Darge to inform him that the CW had a contact who could provide the CW with heroin from Ecuador. Darge furnished the CW with a new telephone number so that the CW could pass this number to the CW's source. On May 10, 2012, the CW's source, a confidential informant (the "CI") working with law enforcement, contacted Darge, at law enforcement's direction, and informed Darge that the CI had a good deal coming in from Ecuador. The CI and Darge agreed to meet in person.

On May 11, 2012, the CI met with Darge in Queens County, NY, and discussed the sale of "Manteca," the street name for heroin. The case agent learned that Juan R. Almanzar had driven Darge to meet the CI. The CI informed Darge that the price would be $50,000 per kilogram, to which, Darge replied that he wanted to start with 500 grams. The CI told Darge that as soon as the CI had the merchandise, he would contact Darge.

On July 9, 2012, the CW contacted Darge, and Darge noted that he wanted to give the CW some money. That same day, the CW met with Darge in the Bronx Apartment, where Darge gave the CW $10,000. Darge also inquired as to when he could get some merchandise. Darge provided the CW with a new number so that the CW's source could contact Darge directly. Additionally, Darge asked whether or not the CW's source could bring the heroin to the Bronx Apartment.

On August 5, 2012, the CI called Darge to inform him that the CI had just received about 3 kilograms of heroin. Darge told the CI that he would take 1 kilogram. The CI indicated that it would cost $60,000. A meeting was set for the following day. Law enforcement agents created two bricks designed to look like heroin, in anticipation of the CI's meeting with Darge.

On August 6, 2012, Darge met with the CI in Queens County. Almanzar drove Darge to the designated meeting place. Darge instructed the CI to walk over to his vehicle, as his vehicle contained a hidden compartment. The CI, in turn, suggested that they discuss the deal outside the vehicle. The CI and Darge then discussed the logistics for their drug

transaction, while Almanzar remained in the vehicle. An undercover officer (the "UC") waited for the CI inside a vehicle with the sham heroin. Darge subsequently took possession of what he believed to be 1 kilogram of heroin and instructed the CI to follow him to the Bronx Apartment so that Darge could test the heroin. Darge further noted that he had $40,000 at the Bronx Apartment.

After Darge returned to his vehicle, he and Almanzar were arrested. Darge has been held in custody since his arrest.

Subsequent to his arrest, Darge informed the Government about certain prior criminal conduct as follows:

From at least 1999 until Darge's arrest, he was receiving one to three kilograms of heroin per month, from couriers that were bringing the heroin into the country by-way-of Columbia. Darge ran stash houses and mills where the heroin was processed, and bagged for distribution. Darge employed a chemist, whose job it was to extract heroin from the material it was contained in; the heroin had been molded into a plastic, that was then used to build the bottom part of luggage that had wheels. These bags passed through airport security, and that

this method is extremely difficult to stop.  Darge supplied the conspiracy with at least three handguns, which were recovered.  Some of the funds from heroin sales were sent back to Columbia to remunerate the suppliers; law enforcement seized $10,000 from one courier that was sending cash back to Columbia.  Darge's monthly net profits varied per month, but were as high as $100,000.  Some of this money is also believed to have been moved to Florida.  Law enforcement identified Darge as a boss; five or six individuals worked for him in the processing and distribution of heroin, many of whom are related to Darge.  Darge used the Bronx Apartment as a residence, and HSI's court authorized search uncovered a small amount of heroin, a small amount of marihuana, and various drug paraphernalia.  Darge reported to law enforcement that the marihuana was for his own personal use.  Darge possessed some 30 different firearms over the course of the conspiracy.  Darge knew that many of these firearms were stolen, including one firearm that was burglarized from the home of a police officer.

**The Relevant Statutory Provisions**

Counts One mandates a minimum term of 10 years' imprisonment up to life, pursuant to 21 U.S.C. §§ 841(b)(1)(A),

846. In addition, a term of at least 5 years' supervised release is required if a sentence of imprisonment is imposed, pursuant to 21 U.S.C. §§ 841(b)(1)(A) & 846.

Count Two mandates a minimum term of five years, to be served consecutive to any other term of imprisonment imposed, pursuant to 18 U.S.C. § 924(c)(1)(A)(i) and (2). In addition, if a term of imprisonment is imposed, a term of supervised release of not more than five years may be imposed, pursuant to 18 U.S.C. § 3583(b)(1).

The Defendant is not eligible for probation on Counts One and Two pursuant to 18 U.S.C. § 3561(a)(1) and because in each count, probation is expressly prohibited by statute.

The maximum fine for Counts One is $10,000,000, pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 846. The maximum fine for Count Two is $250,000, pursuant to 18 U.S.C. § 3571.

A special assessment of $100 per count is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2012 edition of the <u>United States Sentencing Commission Guidelines Manual</u> has been used in this case for calculation purposes.

The guideline for a violation of 21 U.S.C. § 846 is found in § 2D1.1. Since the Defendant conspired to distribute more than 30 kilograms of heroin, the base offense level is 38.

Per §2D1.1(b)(4), since the offense level involved the distribution of a controlled substance in a prison, a two-level enhancement is applicable.

Per §2D1.1(b)(12), since the Defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, a two-level increase is applicable.

Per §3B1.1(a), as the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, a four-level increase is applicable.

11

The Defendant is entitled to a three-level decrease pursuant to §3E1.1(a) and (b), since he has shown recognition of responsibility for the offense.

Accordingly, the Defendant's total offense level is 43, and as set forth in the PSR, he has a Criminal History Category of III. The Guideline range for imprisonment on Count One is life. This is to be followed by a consecutive sentence of five years to be imposed on Count Two.

For Count One, the Guideline range for supervised release is at least five years, with no maximum. For Count Two, the Guideline range for supervised release is at least three years but not more than five years.

Under the Guidelines, the Defendant is not eligible for probation pursuant to §5B1.1, application note #2.

The Guideline range for fines for the instant offense is from $25,000 to $10 million, pursuant to §5E1.2(c)(3)(A) and (c)(4).

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in <u>Booker</u>, 543 U.S. 220, and the Second Circuit's decision in <u>Crosby</u>, 397 F.3d 103.

As set forth below, the Defendant in this case has rendered substantial assistance to the Government in the investigation and prosecution of other persons. Thus, in light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," <u>Kimbrough v. United States</u>, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), the factors set forth in § 3553(a), and the Government's submission on behalf of the Defendant pursuant to U.S.S.G. § 5K1.1, a downward departure from the sentencing Guidelines is warranted in this case.

**Section 5K1.1 Factors**

Section 5K1.1 of the Sentencing Guidelines sets forth

13

five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance: (1) "significance and usefulness" of assistance (§5K1.1(a)(1)); (2) "truthfulness, completeness, and reliability" of information and testimony (§5K1.1(a)(2)); (3) "nature and extent" of assistance (§5K1.1(a)(3)); (4) "any injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (§5K1.1(a)(4)); and (5) "timeliness" of assistance (§5K1.1(a)(5)).

The Government has determined that the Defendant has provided substantial assistance in the investigation and prosecution of other persons. In particular, the Defendant's assistance was significant and useful to the convictions of various offenders (U.S.S.G. § 5K1.1(a)(1)), the information he provided was truthful, complete and reliable (§5K1.1(a)(2)), the nature and extent of the assistance was particularly significant (§5K1.1(a)(3), there is danger or risk of injury to the defendant or his family as a result of his assistance (§5K1.1(a)(4), and the assistance given was timely in nature (§5K1.1(a)(5).

14

Given the above, a downward departure from the Guidelines sentence is merited in this case.

**The Sentence**

For the instant offense, defendant Darge will be sentenced to a term of imprisonment of 45 months. The term of imprisonment will be followed by five years' supervised release on each count, to run concurrently.

Darge is directed to report to the nearest United States Probation Office within seventy-two hours of release to commence his term of supervised release. It is recommended that Darge be supervised by the district of his residence.

As mandatory conditions of his supervised release, Darge shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) refrain from any unlawful use of a controlled substance and submit to one drug testing within fifteen (15) days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer; and (5)

cooperate in the collection of DNA as directed by the probation officer.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed, as well as the following special conditions:

The Defendant will participate in a program approved by the United States Probation Office, which program may include testing to determine whether the Defendant has reverted to using drugs or alcohol. The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer. The Defendant will be required to contribute to the costs of services rendered (co-payment), in an amount determined by the probation officer, based on ability to pay or availability of the third-party payment.

The Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be

conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

A special assessment of $200 ($100 for each charged count) payable to the United States, is mandatory and shall be due immediately.

Since the Defendant does not have the ability to pay a fine, no fine is imposed.

Pursuant to Count One, the Defendant shall forfeit his in interest in any of the assets obtained via commission of the instant offenses.

Pursuant to Rule 32.2, "[t]he Court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at the sentencing. The Court must also include the forfeiture order, directly or by reference, in the judgment."

The terms of this sentence are subject to modification

at the sentencing hearing scheduled for September 19, 2013.

       It is so ordered.

New York, NY  
September 16, 2013

ROBERT W. SWEET  
U.S.D.J.

18